Good morning, Bob Gunther for Genentech. The District Court articulated two reasons for denying… Before you begin, could I ask a question before we start your clock running? There are a lot of confidentiality designations in the briefs. Two of the subject matters are really central to the disposition of the case and perhaps too important to anything we may say today. One of them in particular has to do with the licenses and various facts relating to the confidentiality representations still obtained, it's going to be a little difficult to talk about that issue. So I would ask the parties, is that something which the passage of time has rendered no longer necessary to respect confidentiality or not? Your Honor, I think with respect to the licenses in particular, the answer to the question is yes, the passage of time has changed things. So we can talk about… We can talk, yes, and in particular we can talk about what the terms of the licenses are, Your Honor, when license entry would be permitted, I think is now, for the most part, at least in terms of the first entrant, has become clear. Okay, now there's one other issue, and this may be more appropriately addressed to Mr. Your Honor, from our perspective, we think that that information, which of course is FDA, was back and forth with the FDA, we think that, again, that ought to be open, that ought to be subjects that we can discuss. We agree that it's central to the appeal on the delay issue. Okay, well let's see if… Yes. Your Honor, it's okay with us. Okay, so those two are off the table. Yeah, can we start the clock back at 15? Thank you. Thank you very much, Your Honor. Can I just start off by asking what at this stage of the game kind of remedy are you seeking here? Your Honor, we continue to seek a preliminary injunction. We believe that this drug that is at issue in this case, Herceptin, which is in fact a cure for women who receive the drug… Well, you've got the licensees on the market, right? That's correct. There are others on the market. How many other products are on the market? There are now two, in addition to Amgen and Genentech, there are two additional biosimilars that have come to the market. Do you think that makes your case about irreparable harm a little tougher at this stage of the game? Your Honor, I would argue, and I think we put in evidence to this effect from our economist, Dr. Jenna, which is in the record, that in fact the entry of those other biosimilars, and the two that have entered at this point are Mylan and Pfizer, that makes the irreparable injury even more difficult because at this point now we're trying to conjure a but-for a world where other folks have entered, license entry has occurred, and now we're trying to figure out, at that point, remember, because they skipped, they jumped to the head of the line and decided to launch at risk, now the fact that we're trying to unwind all of that at this stage becomes even harder. But the unwinding in the sense that you mean, I think, would involve going back to July and figuring out what would have happened in that four-month period before the others entered the market. But that's not where we are right now. Where we are right now is there are already two other players in the market. So if you judge, if, for example, this case were to go back to Judge Conway and you were asked, as of now, what's the irreparable harm, wouldn't that be a tougher call for you, a tougher lift? Your Honor, I don't think so. And the reason I say that is that even though there's certainly an important period here, which is between July and November, and that's happened, and that's happened, and I recognize that. But, Your Honor, the impact of that launch that began in July and continues to this day is actually having an impact, continues to have an impact with respect to the issue of whether or not we can actually set forth a compensable damage claim for all of our compensable damages. As I understand it, your position with respect to the injunction that you would seek is that you would not seek to enjoin patients who are currently on Amgen's product, but only patients who would begin to use that after the injunction is entered. That's correct. That's correct. And we're talking about, the trial in this case is in April, April 20th, I think. Yes. So we're talking about five or six weeks, and only those patients who would become starting patients taking Amgen's drug between now and then, that seems to me to be a pretty small window of, I wonder if that's significant enough for the disruption that would occur upon stopping the Amgen drug from being sold, and then, if they win the case, starting it again six weeks hence. Right. And your Honor, what I would say to that is they have, as of the end of this year, one of the things that they have projected is that they're going to get the largest market share with respect to this product. But the market share we're talking about is just the share of new patients between now and April 20th, right? Well, I think it's actually, I think in terms of looking at irreparable harm at this moment, your Honor, I think that that's right. But that is huge. Remember, this is a huge drug, and with respect to the biosimilars, it's a huge market with respect to them as well. So even though we've made the concession that we're not going to ask people who have already started on the drug to come off, one of the perverse aspects of that, your Honor, is that the more, remember, they decided to take self-help to infringe the patents and go forward, and as they do that, they're actually increasing the amount of patients that have been started with this drug. And then, to turn around and say that in that context, that we're somehow, we should somehow be put in a box with respect to irreparable harm, seems perverse. And I would say, in addition to that, we are, we're in a position where this market is- I don't understand. Can you explain to me the comment you just made? Sure. I don't understand what is perverse about the position you made. So if you think about it, yes, so if you- I mean, you had an adjudication of the irreparable harm issue a while back. You appealed it to this court, and it was rejected. So nothing about that is perverse. You may disagree with that, but that was the judgment at the time. And, your Honor, I'm not suggesting that the judgment on the Rule 8 motion was perverse or anything like that, despite the fact that we tried to get before you as quickly as we can. What I'm saying, though, your Honor, is that, and I apologize if I'm not being clear on this, is that as they continue to start patients, that becomes an additional argument for them that, you know, in terms of balance of hardships, for example, that you ought to look at this in a different light. And what we're saying is that, again, if you think about this in terms of what they did, deciding to launch at risk with no non-infringement argument in the face of IPR decisions that it upheld the validity of these patents, that to put us in a box where we then can't basically say that even though the trial is in April, that there is important time left on this very, very significant, important drug. Every day counts, you know, in our estimation. Mr. Dunn. Yes, sir. Refresh me. Isn't a preliminary injunction an equitable analysis? Yes, sir. Okay. And the Court specifically found undue delay in seeking the preliminary injunction. Yes. That sort of pops up when you're talking about every day being important. Yes. But it looks like what the Court said was that the delay was so significant that it precluded a determination of irreparable harm. And the way the Court lays it out, it looks like an ambush on your part. On their part. On your part. Well, Your Honor, let me respond directly to that. What the Court determined is that we were required, and this is the first time, this after receiving Amgen's BP CIA notice. Yes. Three months after receiving a fairly specific launch date, and almost one month after Amgen had FDA approval to launch its product. Let me deal with each one of those three periods. Sure. The first one is the notice of commercial marketing. That was in May of 2018. They weren't approved until 13 months later in June of 2019. What happened during that period? Ten days after they sent us a notice of commercial marketing, on May 25, 2018, they got a complete response letter from FDA. What did that mean? That meant that they would not be able to get approval for that drug until they responded to the complete response letter. It took them seven months to do that. They didn't do that until December 28, 2018. When they did it, when they responded, Your Honor, they went from a full label and said, we don't want that anymore. They went to the, you're aware of that. And they didn't change back to the full label until March, after they made a determination commercially that they didn't think they would be able to successfully sell the product that way. So that takes us to March. Now, the second part, Your Honor, is the point in April that the district court identified, where he said, OK, at this point, certain things were unredacted, and now you knew they were thinking about potentially launching in July. And Your Honor, what is extraordinarily important there is that all of their witnesses, and we tried to depose everyone we could get our hands on, said in sworn testimony that while they were making sort of launch readiness plans, that there was no decision to actually launch the product. And in fact, after FDA approved- Are you suggesting that there's some notification requirement to you that they're actually going to launch? Your Honor, I think that- They were prepared, the record before the district court is clear, right? That they intended to be, at all times, they intended to be prepared to launch in July 2019. Are you typically notified by competitors of their intention to launch a particular day? I can tell you what happened in one of the other cases, Your Honor, in this very situation. And it's referred to in the district court, I think it's footnote six in the district court's opinion. There was another biosimilar, and I'm going to be careful here in terms of what I say in terms of confidentiality. Another biosimilar told us, they said, if a particular thing happens, we will launch on X date. And what we did, once we were told that, is we went to the district court judge and we said, they told us this, we'd like to set up a procedure for a preliminary injunction motion. And we did that. And then- That may be nice, but my question went to more of whether they're required to do that or they typically do that. I mean, that was very nice that you worked it out with that one particular company. I think, Your Honor, it's mixed. I think it's mixed. Sometimes people do tell, and this is an example that I'm giving you right here. Sometimes they don't. But whether they have a requirement, and I'm not saying that there's sort of a flat-out requirement that they tell us. What I am saying is that in assessing the issue of delay and looking at whether harm is imminent, that it's extraordinarily important to focus on what they are telling us and what they are telling the court. And what they told us and what they told the court, even weeks after they obtained FDA approval, was that they had made no determination to launch. And in fact, one of the statements of counsel was, and this is in June of 2019, it could be- So is it your view that if you had gone the week before or two weeks before to the district court would have said, no, no, no, no, we don't have any authority to be here because we don't have any specificity as to the date that they've indicated specifically that they're going to launch? Your Honor, I think they would have. And the reason I say that is that they were making those statements to the district court in order to maintain privilege over opinions. And what they were saying is, hey, we don't have- I'm sorry. They were making those arguments in order to say that they had not come up to a point in time at that point where they would have to produce opinions of counsel on the issue of willful infringement. And so they were arguing. They were affirmatively arguing to the district court as late as June, after FDA had approved their product. They were affirmatively saying, it is not right for you to determine whether or not we have to produce the opinions of counsel because we haven't made a decision to launch. And so in that context, our position is that- and again, it's when we're required to actually go. And what the district court said is, you're required- in this context, even though they're telling you they haven't made a decision, you're required to do it even if you get to court, as we did, before they launched the product. And this court has never found delay in that circumstance. And if you think about it, it really doesn't make a lot of sense. And the reason I say that is that the whole point of looking at delay is that if you suffer the irreparable harm, if you allow the sales to start, and you allow them to continue, and the status quo changes, at that point, if you just sort of wait around, well, yeah, maybe that's a good indication that you don't think that the harm is irreparable. But we got in there before they launched. Let me ask you this question. Moving from the irreparable harm- I mean, moving from the delay to another aspect of irreparable harm, the license. Yes, sir. Suppose that you had licensed on day one, on, let's say, July 1st or June 15th, to these other entities. Do you think then that the argument for irreparable harm, your argument for irreparable harm, would be significantly weaker than it is now? I don't think so. And again, that goes- Do you think it would be just as strong as it was with the delay, even though the argument you made in your brief is that that four-month period was really critical in assessing the irreparable harm? We certainly made that argument, Your Honor, but we also went further than that. And district court didn't deal with this, and the other side didn't deal with this. But we also said that once those licensees launch, that it's even going to get harder. And we put in testimony from an expert that's in the record on that. And we also, the other thing that we did, Your Honor, and again, this is in the record, is that we pointed out, and this is from testimony from our witnesses as well as documentary evidence, that Amgen is a particularly dangerous competitor. So to cut to the chase- Yes, sir. I don't want to use up all your time. Yes, sir. But are you saying that you would have been better off with respect to irreparable harm if you had licensed those other companies to begin distributing right away? No. I'm not going that far. Okay. That was essentially my question. I'm not- No, actually, we'd have a stronger case. Well, to the extent that I was sort of suggesting to you that the case is stronger, that wasn't my intent. My intent, Your Honor, and again, if I'm not being clear, I really apologize. But my intent was to say that I don't think it detracts from the strength of our case in terms of irreparable harm. Why don't we- you're well into your rebuttal, so why don't you reserve some of that time to look at Mr. Lowe? Thank you, Your Honor. May it please the Court. Amgen's biosimilar, Cangenti, has been prescribed to patients now for eight months. It's joined by two other biosimilars that Genentech chose to license. Both on the facts before the district court and they exist today, the district court did not commit an abuse of discretion in refusing to ban Cangenti from the market. What is your view? Is it clear from our cases that it's whether you can, not whether you will, in terms of launch? I mean, the issue here in terms of the timeliness of the district court. The other side seems to be saying, you seem to be saying you could have launched, you were prepared to launch, and therefore it was incumbent upon them to seek the PI early. Right. Well, the district court found that based on discovery, and this is beginning in April, the discovery, quote, made clear Amgen's plan to launch marketing for Cangenti in July 2019. And it drew a reasonable inference based on the delay after delay as evidence mounted on evidence mounted that we are going to launch in July 2019. And it drew the inference that if you really are threatened with irreparable harm, if the early, before someone actually makes that final decision and pushes the button to launch. And the fact that there was a decision maker out there that had to make that final go, no-go decision, as the documents describe it, doesn't mean that you get to sit on your hands. When that button is pushed, that means you're going to be suffering. And if you sit on your hands, they become unclean. Pardon? Yeah, well, we'll deal with that equitable doctrine in some other case. But, so it wasn't just that Genentech received notice of our intent to market back in May of 2018. It was that they received unredacted documents, documents so that redactions were moved that, as the district court said, enabled Genentech to see that Amgen planned to launch Cangenti in July 2019. That's three months ahead of the launch. They didn't move for an injunction. In fact, at a hearing in May, they said, we're not currently asking for an injunction. Then the district court noted that. And the court noted that, yeah, Appendix 7, Note 6, exactly. And the district court found that from April to mid-June, five Amgen witnesses testified, giving a fairly specific launch date in July. And I could walk through them. Our plan is to launch sometime in July. That's Robert Jackson. Shane Hall, we're targeting being called to launch in July. Dale Skeeters, we're targeting July 13th or 14th. We read it. Again and again, they were told. And yet, once again, did not move for the injunction. Thin Cangenti gets licensed in June, June 13th. Five days later, there's a hearing in district court on June 18th. They don't mention the possibility of an injunction. They don't move for an injunction. They don't say, we're getting ready for an injunction. What date was that? That was June 18th. June 18th. There was another hearing June 18th. When you have those repeated failures to try and seek the relief, the district court's able to draw a factual inference. I think the First Circuit has called it having evidentiary significance. You can infer that it's just not a credible claim of rebel harm. And the district court committed no abuse of discretion. It didn't commit any clear error in making that determination. And the undue delay alone was capable of preventing them from showing irreparable harm. Now, I know that counsel has mentioned that there is a response letter to the FDA in December. But that actually supported the district court's decision. Because it's a well-known fact, and the district court says it in its opinion, that six months after you get the response letter, FDA is likely going to be granting that approval. And that meant that we're going to get approval in June. So this had all the spontaneity of a rocket launch. We knew that this was going to happen. The skinny label. We went back to the full label in March. No request for an injunction. We got approved with the full label in June. No request for an injunction. Well, but the approval, the way you articulated that, it sounded like you were saying that the approval was a done deal. There was no question. I suppose there is some question. No, you're supposed to get a decision within six months. A decision. And it was conceivable that the FDA might do the opposite. But it's well known to parties, and to counsel as well, that you can go into district court and you can get the injunction even before the FDA has issued the label. You could, but the question is, are they to be held accountable for not having done so prior to the FDA's approval? It seems to me that your case, of course, becomes stronger as you get closer to the July date. But I don't know that you have a terribly compelling case for delay prior to the FDA approval. Well, Judge Bryson, this isn't a case of like latches or something like that where you have a legal rule. I understand. It's a question of the reasonableness of their conduct. And it seems to me that for them to say, we'll see if the FDA approves this. They didn't approve it previously. We'll see if they do now, is not unreasonable. Your Honor, I think it is unreasonable. When you have document after document saying that there's a July launch, we're planning for a July launch. If we get approval. We can't launch without approval. If you get approval. But when you get up on that, at least once the approval is there, you don't go to the next hearing, say nothing about an injunction. But I'm focusing on the date of the approval. Right. Now, that may still be enough delay to support the district court's finding. But I'm wondering whether the delay goes back any farther than that. I think it does go further back because you're entirely capable. The way the BPCIA is structured, you can go in and you're given discovery to find out things like the launch date. You're given an artificial act of infringement so you can get into court early. You're given notice of intent to commercially market. So even claims that haven't been selected for litigation can be the subject of a lawsuit and a preliminary injunction. It's right there in LAB, I think, where it says preliminary injunction. So all those things are available to you. From the moment somebody files their biosimilar application, that's an artificial act of infringement. When you're confronted with all of those opportunities, all of those vehicles, all of those ways of finding out the launch and preventing it before someone pushes that final button, if you have all those things, it's simply not reasonable to let opportunity go by after opportunity go by. And even if it otherwise, it's all in the discretion of the district court. Whether I or someone else might think that this was an okay timing, the district court who was with the parties at hearing after hearing after hearing and saw all this unfold, that district court exercised his discretion to say, based on these repeated delays and the 11th hour attempt to prevent it, which engineered the circumstances that the BPCI seeks to prevent, the district court was well within his discretion and certainly committed no factual error in finding that there was undue delay that weighed dispositively against it. Go ahead. Have you turned to the licenses? I think I should do that now. Okay. Assuming, let's assume that the licenses had been issued not with a delay period, but for immediate launches for the licensed parties. What is your assessment of the impact of licenses on the question of irreparable harm? Your opposing counsel has suggested in the briefs that this was, the judge used a kind of per se rule. What do you think the right rule is that a judge should use in assessing the presence of licenses vis-a-vis irreparable harm? I think it's highly contextual, Judge Bryson. I think the district court here was very sensitive to that context because the judge looked at the features of the licenses. He looked at who was licensed, Celtrion, Mylan, Pfizer, and I would add, Samsung BioEpsys. So, virtually every other competitor was now licensed. The district court looked at the financial terms, and that's sealed, maybe I shouldn't mention it, but the specific financial terms are mentioned in his opinion. It also looked at when entry would occur, and it was a short time away. And the district court was able to infer from that that, look, someone doesn't give up so much exclusivity. This was, gave up exclusivity two years, at least two years before the patent expired, in return for so little, for so many people, if entry creates irreparable harm. Genentech had to know roughly how much harm it was going to suffer, and the harm wasn't irreparable because it was letting competitor after competitor after competitor into the market. That's a fair and reasonable inference for the district court to draw, and it isn't a clear error for the district court to have drawn that inference on these facts. In the district court's ruling, in page nine of the appendix, you look at right at the top, it says, under these facts, the district court looked at the specific facts of this case, the specific facts of these licenses, and drew a specific inference from them. What do you think would be the kind of facts where you had licenses, but the district court would be in error by finding that those licenses effectively produced irreparable harm? So, I think that they wouldn't result in irreparable harm. And I think that Samsung versus Apple identifies one. There was a license to IBM, but IBM was using an infringing product, but it wasn't a competitor. It wasn't the same product. It wasn't a competitor in the market was one of the answers. And there was another party that was using it, but it specifically carved out certain things that would prevent it from being a competitor, or it used it in a very different product. Or if they were de minimis. Pardon? Or if they were de minimis. Right, or if they're de minimis. But Pfizer, Mylan, these are no slouches, Your Honor. These are serious competitors in the market. So, under certain facts, you could license people, you could license even potentially competitors to the market. And the district court, on a careful analysis, could, under particular facts, find, no, you can still have irreparable harm from Amgen entering. But on these facts, the district court had before it, and on the analysis the district court gave, who, when, what financial terms, that the district court committed no clear error, and it certainly didn't abuse its discretion based on the licensing amount. So you want to turn to where maybe you wanted to start, which is where you started with your friend, which is, what does it do to us to be here or not today, in terms of the appropriate relief that would be available? Honestly, Judge Preston, Judge Roth, I'm a little bit at a disadvantage because I'm a Pelley, and I frankly don't fully understand the strategy of bringing me here today when we have trial one month away in April. Well, to be fair to them, they filed their brief in July. So at the time they filed their brief and initiated the case, as far as they were concerned, there was plenty of time. At this point, I think the notion of sending this back to the district court for irreparable harm analysis on the facts as they exist today, there's no way this case comes out differently. And so it seems to me that, effectively, the passage of time has, in some sense, mooted all this because now we have the competitors on the market. It's not a future entry. It's a current entry. Now we are on the market, and we're actually, patients are being treated with our drugs. So it seems to me that under the circumstances, it's really just not a good basis for reversing, even apart from the fact that the district court committed no clear error and that there was no abuse of discretion. And that's even without going to the public interest factor, which I'd like to turn to last. And that is that the district court really understood that the injunction sought here would address, would reach two of four indications, indications that were not argued, not alleged, to infringe any valid patent. And the district court understood, look, that would be contrary to the patent bargain. Herceptin, there was a period of exclusivity for it. And they obtained that period of exclusivity on the composition of matter patent by disclosing Herceptin and making it capable of being used by others following the expiration of the patent. For Genentech to turn around and then say, well, we're going to take two uses of Herceptin that are not alleged to violate any other patent, infringe on any other patent, and to try and take them off the market, that simply went too far for the district court. It's contrary to the public interest to allow a competitor that has an expired patent and then try with an injunction to reach overbroad and basically preclude indications that are not even arguably infringing. Your opposing counsel argues that that problem could have been solved if you'd gone back to the skinny label. But mechanically, I was left wondering if you had decided to do that, if you'd decided in July, you know what, we're too worried about the possibility of infringement. Let's go back to the skinny label. What would you have had to do to implement the skinny label? Would you have had to go back to the FDA? So I think I should draw a distinction here. If we were worried about infringing, we wouldn't necessarily have to change the label. We might merely change the way we market it. But if we were subject to an injunction that said, and mind you, the problem here is they never asked for a skinny injunction that only prohibited the infringing uses. But if they asked for that injunction and they were granted such an injunction, we would have to make a choice. Do we change the way we market it? Should we go back to the FDA and ask them to adjust the labels so the label only has the truly clearly nobody claims that they're infringing uses? Those are the types of decisions we'd have to make. But ultimately, it was the burden of Genentech to go to the district court and ask for an injunction that only prohibits infringing activities. It doesn't reach non-infringing activities that are in the public domain. That was their burden, and they simply never before the district court said, I want a narrow injunction. They never said it in their opening brief. I don't even understand their reply to say, we want a narrow injunction that only reaches the accused uses and excludes the non-infringing uses. But you say that mechanically all you would have to do, if you came up prior to the injunction request having been filed, and you decided, you know what, we don't want to take the risk here. We'll just go with the skinny approach, the skinny label. You could do that just by changing your label without getting FDA approval? No, no, no. I think, yeah, if we wanted to change the label and we thought it was necessary to change the label, we would have to go back to the FDA to change the label. But if you didn't change the label, presumably you'd still be exposed to an argument that, yeah, you may be saying in your marketing that this is only for the limited purposes, but your label allows it to be used. I suspect that there will be arguments along those lines that are raised and addressed by the jury at an upcoming trial in April, whether or not there is inducement and things like that. And I suspect that they will point to the label as an inducement. But that's all a matter of things for trial later on. I think right now the fact is when you're seeking an injunction, you have to ask for a properly tailored injunction. Genentech never sought an injunction that excluded clearly and admittedly non-infringing uses. The district court didn't abuse its discretion in saying that simply goes too far. You can't take things that have been dedicated to public domain away from your competitors when they're not accused of infringing on any other patent. If there are no other questions, I'd be happy to take my seat. Thank you. For those reasons, we ask that the judgment be affirmed. Your Honors, maybe taking these in reverse order and talking about the public interest first. On that point, the label is what we would say in terms of inducement infringement. So unless they actually change the label, being out there with an 863 label but saying, well, we're really not marketing that, that would not do the job. And our point on the public interest is 75% of the uses, everyone agrees, are infringing uses. With respect to the delay point, and my friend talked about the issue of the June 18th hearing, I really think it's important to understand what was said by Amgen's counsel at that hearing. Remember, this is after FDA approval. It's about five days after FDA approved their product. And they said to the district court, if we were to launch in two months versus six months versus a year, Amgen would still need to make preparations to launch, to be prepared in a position to launch. They were affirmatively stating to the district court not only that a launch decision had not been made, but it might not be made for as long as a year. What page are you on? I am on Appendix 1277, page 30, lines 3 to 8. Thank you. Well, yes, yes. While we're looking for that, let me just confirm that you did not ask for the narrow injunction, I take it, including only infringing uses. We did, and the reason being, Your Honor, we did not. We did not. And the reason, Your Honor, the specific reason we did not is that as long as their label had 863 on it, that's an infringing label. And so effectively what we said – Now, of course, you could incorporate that in your request for an injunction, that neither the uses nor the label – Well, fair enough. And I think the point, though, was that we never said – and, of course, they were thinking about, from the period of December through March, going with a skinny label. We never said they couldn't do that. And, in fact, our position is that if they wanted to go back and get one, that's fine. But in the interim, we could supply the market. And so there was no reason for making a determination on the public interest with respect to that issue. Your Honors, with that, we would ask that the court respectfully reverse or remand the decision. Thank you very much. I'm sorry. I cut you off when you were about to respond to Judge Wallach's question. Well, Judge Wallach, I actually pointed you to that specific statement. Yeah, I'm not – I'm not selling you with that? You're not selling me with that. Okay. Because of where the court's coming from in that questioning. And I don't look on that as a representation of anything other than what we're talking about. Let me give you one more. We're talking about opinion. Yeah, let me give you one more, and it's in that same back and forth with the court and counsel. And this is Appendix 1276 at line – at page 29, 10 to 17. Yeah, that's where I started. Okay, good, good, because you want to look. Well, here's what the counsel – I don't think it helps you. It's opinion letters. It's about opinion letters. Well, it certainly is about opinion letters, but think about it in this context, Your Honor. If they were saying it wasn't ripe so that they could protect – continue to protect their opinion letters, how can they turn around and say, well, you know, but it was ripe in terms of us being able to make a determination that harm was imminent in terms of a preliminary injunction. And the point that I wanted to get to directly, Your Honor, because I want to try my best to see if I can sell you on this, is that if you look at what the counsel says is making a distinction at that point in the record between getting launch ready and whether they will ever launch before the expiration of these patents. They're getting it all ready. She's talking about Amgen. They're getting it all ready for an ultimate decision maker to decide, and what's the decision? Whether or not we take that product and we launch it before the expiration of the patents. Now, in that context, Your Honor, for us to be sitting there and told that even though FDA approval has occurred and even though we were in front of the district court within three weeks, the three and a half weeks after FDA approval occurred, Your Honor, that we delayed, the district court felt that it was jammed. I get that. He was very frustrated by the fact that he felt that he was jammed in this situation. But I would ask Your Honors to consider whose fault is that? Is that our fault or is that the fault of people who were telling him, 36 witnesses that were telling us? Well, A, I don't buy your argument. B, I think the district court's closer to the circumstances and knows who's jamming whom. And C, I think that what you're representing to this court is not squarely on. And I'm not saying you're making a misrepresentation. I'm just saying it's not squarely on where the district court is. I hear you, Your Honor. And the one thing I would say to you is it's one thing if the district court said, you know what, I'm looking at all this, including what you've pointed me to, and I don't buy it. He didn't say that. He never even dealt with these statements that I'm reading to you. And so what I'm saying is— He was aware of them. Well, Your Honor, he certainly should have been aware of them. But the fact that he didn't say anything about them, I think— This is done as a fire drill, and he wrote what I thought was, given the time constraints and given the fact that he has to deal with the heaviest patent docket in the country right now, 250 patent cases per judge per year in Delaware, the fact that he was able to write as much as he wrote is remarkable. And to hold him accountable for not having written something on every point that you made seems to me to be asking a lot. Your Honor, let me respond to that because I think Judge Connolly is a terrific judge. We've been in front of him for a couple of years now on this case. And so I am not suggesting that Judge Connolly is somehow sort of lacking in terms of ability or— But you're suggesting he was the ball on this issue. I'm suggesting that he wasn't required to swing at all the pitches. I agree with that, Your Honor. And look, here's what it comes down to at the end of the day. It comes down to whether or not, in view of these statements that I've read to you, I can convince the court that in that context, if there is any sort of— blame is not even the right word. If you're going to put the risk on one of the parties, in view of those statements, I think it's fair to put the risk on them, not us. Now you may disagree with me on that, and I think Judge Friedman, you may well— No, I have Judge Friedman. Oh, I'm sorry, Judge Wallach. I apologize. I think we're going to bring this to you. Thank you very much, and I appreciate you letting me go way over my time. Thank you for taking me back to law school and Robert Cole talking about the risk of non-persuasion. Thank you, sir. I think they both like the case that's been concluded. All rise. The honorable court is adjourned until tomorrow morning at 10 o'clock a.m.